Calvin **GREEN** and Travis Hazelwood, **Individually and on the Behalf of All Others Similarly Situated, Plaintiffs,**

v.

**TOWN OF HAMDEN,** et al, **Defendants.**

No. 3:97cv1024 (JBA).

United States District Court, D. Connecticut.

Aug. 9, 1999.

David N. Rosen, Stephen Mark Pincus, Rosen & Dolan, P.C., New Haven, CT, for plaintiffs.

Joshua Alan Winnick, Winnick, Ruben & Chambers, New Haven, CT, Burton S. Rosenberg, Town Attorney's Office, Hamden, CT, Stephen P. Fogerty, Robert Avery Rhodes, Halloran & Sage, Westport, CT, for defendants.

### RULING ON MOTION FOR PRELIMINARY INJUNCTION

ARTERTON, District Judge.

The plaintiffs, both African–Americans and both unsuccessful applicants to the Town of Hamden's fire department, seek a preliminary injunction to enjoin the defendants from any further hiring of entry-level firefighters from the 1997 entry-level firefighters eligibility list pending full trial on their discrimination claims. Plaintiffs contend that the 1997 written examination had a disparate impact on minority firefighter applicants in violation of Title VII of the Civil Rights Act of 1964 as amended in 1991. The defendants maintain that the test was "content valid" notwithstanding its disparate impact, and therefore justifi-

able as job related and a business necessity and not violative of Title VII.

As Chief Timothy Sullivan testified, there are currently ninety-two fire fighters in the Hamden fire department, five of whom are African–American. Hamden has hired thirteen of these firefighters from the 1997 eligibility list; eight were white; two were African–American; one was Hispanic; and two did not self-identify their race. (*See* Pl.'s Ex. 31, Defs. Response to Interrogatory # 19). There are currently four or five entry level firefighter vacancies in the Hamden fire department. The eligibility list expires August 15, 1999. The seven applicants designated to be considered for these vacancies are white.

For the reasons set forth in this opinion, the plaintiffs' motion for a preliminary injunction is GRANTED.

## I. Preliminary Injunction Standard

■ A preliminary injunction "is an extraordinary and drastic remedy which should not be routinely granted." *Medical Soc. of the State of N.Y. v. Toia,* 560 F.2d 535, 537 (2d Cir.1977). Inasmuch as this case seeks to enjoin "government[al] action taken in the public interest pursuant to a statutory or regulatory scheme," the plaintiffs must demonstrate their likelihood of success on the merits of their claim and irreparable harm to be entitled to the injunctive relief sought. *Sal Tinnerello & Sons, Inc. v. Town of Stonington,* 141 F.3d 46, 51 (2d Cir.1998).

> This exception reflects the idea that government policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly.

*Able v. U.S.,* 44 F.3d 128, 130 (2d Cir. 1995). *See also International Dairy Foods Ass'n v. Amestoy,* 92 F.3d 67, 70 (2d Cir.1996); *NAACP v. Town of East Haven,* 70 F.3d 219, 224 (1995).

## II. Factual Findings [1]

*Written Examination*

The entry step to Hamden's employment selection procedure and placement on the Firefighter Civil Service Commission Eligibility List was a test composed of 100 multiple choice questions, designed by Cooperative Personnel Services, Inc., (CPS) to be used by municipalities as an "Entry Firefighter" test (Model 2116A, 1997 Written Examination). CPS makes no recommendation as to what score should be considered a passing score and leaves that to be decided by each municipality. In Hamden, only applicants who received a "passing score" on the 1997 Written Examination could advance to the next stage of defendants' employment selection process. Therefore, this written examination served an initial gatekeeping function and precluded any applicant who fell below this score from taking the agility test or the oral examination, and thus excluded that applicant from further employment consideration. In other words, applicants were not considered on their overall combined performance on the written, oral and agility measures.

Originally, Hamden set the passing score on the written examination at 75%, which resulted in only one minority applicant achieving a passing score. Subsequently, the Town reduced the cutoff to 60% in order to include more minority candidates as an effort to comply with the Town's affirmative action policy. Under the revised scoring, Mr. Hazelwood passed the written examination (69%), but Mr. Green (38%) did not. The white, African–American and Hispanic pass rates on the written exam were 78.8%, 33.3% and 28.6% respectively. The minority pass rate as a whole, comprised of African–American and

---

**1.** The following facts are either undisputed or represent the Court's Fed.R.Civ.P. 52(a) factual findings based on the record established at the hearings held on July 22, 1999 and August 11, 1999.

Hispanic applicants, was 31.6%. According to the undisputed expert testimony, the difference between white applicants and the minority subgroup applicants as well as minority applicants as a whole is "very highly statistically significant" as determined by the Chi square test. (*See* Affidavit of Dr. Jofre–Bonet, Pl.Ex. 32).

Mr. Binkoski, the former director of personnel at the time the test was administered, testified to what, at best, can be described as a casual rationale and decision-making process for selection of the final passing score of 60%. He believed that the written examination was weighted 60% in the ranking of candidates on the Eligibility List, and that the median or mean test scores fell somewhere between 60%–65%. This prevalence of the figure "60" seemed to figure in the decision making. In reality, the written examination was weighted by only 50%, and no professionally accepted standard or methodology was offered to substantiate use of this cutoff point for this test as reasonable and consistent with expectations of competency for firefighter job performance. Dr. Howard Fortson, defendants' expert who designed and conducted the validity study for the 1997 written examination, testified that CPS did not evaluate, recommend or suggest any particular passing score to be used, but recommended factors that should be considered under each municipality's individual circumstances, including number of openings, performance on the test, impact and diversity. The record contains no indication if Hamden sought, received or followed any CPS recommendation. Dr. Forston declined to formulate any opinion as to any minimum score on this test that would measure minimum entry-level firefighter competency.

*Validation Study for CPS's Entry Firefighter Examination (Model 2116A)*

Defendants rely solely on Dr. Forston and the Validation Report conducted by CPS in November 1996 to demonstrate the 1997 written examination's content validity. (*See* Def. Ex. 2). Dr. Forston is employed by CPS and was responsible for supervising, coordinating and writing the CPS Validation Report.

As the first step in CPS's validation study, a job analysis was undertaken. Questionnaires were distributed to approximately 800 firefighters, requesting their identification and ranking of the knowledge, skills and abilities (KSAs) that they regarded as important for performance of the job of firefighter. From this data, CPS identified and ranked the top 142 KSAs. Thereafter, a panel of seven outside fire department deputy chiefs and trainers was assembled to serve as subject matter experts (SMEs) whose input was used to link the KSAs to important fire fighter tasks, to determine which KSAs resulted in better job performance if increased, and to link test content areas to the KSAs they measured.

Through this multi-step process, CPS determined that 109 KSAs were not amenable to measurement by a written instrument, 5 were not suitable for a multiple choice examination, 3 were not essential to be present at job entry, and 3 were not clearly important to firefighter performance. In addition, 5 other skills were eliminated as less important and 3 others were eliminated as not measuring report writing capability. At the conclusion of this process, CPS determined that the 1997 written examination was a valid measurement of 12 of the 142 knowledge, skills or ability areas which were important for firefighter performance. The remaining 130 KSAs would require measurement by other means such as oral examination, agility test, interview or other individually demonstrative means. Dr. Forston's opinion, as expressed in his validation report, was that this examination is content valid for the 12 KSAs it tests for.

*Creation of Eligibility List*

Hamden currently fills vacancies in its fire department from the Hamden Firefighter Civil Service Eligibility List, created on August 15, 1997, which contains the

names of the ninety-six candidates who passed the written examination, the agility test and the oral examination. These names are ranked by a composite score weighted equally between the candidate's score on the written and oral examinations, although only applicants who achieved the designated passing score on the written examination were invited to take the agility test and the oral interview. Even though Mr. Hazelwood was deemed to have passed the written examination, he did not take the agility test,[2] and therefore is not on Eligibility List. Mr. Green was disqualified from taking either the agility test or oral interview since he failed to achieve the passing score on the written examination.

The current Firefighter Civil Service Eligibility List is set to expire on August 15, 1999. Thereafter, the Civil Service Commission intends to create a new Firefighter Civil Service Eligibility List based on the results of the written, agility and oral examinations administered during the Spring of 1999.[3]

*Hamden's Selection Process*

When vacancies arise, the Fire Chief notifies the Civil Service Commission of the number of vacancies and it forwards the names of candidates from the Firefighter Civil Service Eligibility List to the Fire Commission for consideration.[4] The method used by the Civil Service Commission to select names from the Firefighter Civil Service Eligibility List has at times been by rank order from the top of the list,

while at other times the Commission has selected names list-wide to include minority candidates for consideration pursuant to affirmative action policy. From the names forwarded, the Fire Commission interviews all candidates and makes its hiring decision. The names of those candidates interviewed by the Fire Commission, but not selected, are returned to the Eligibility List and may be reselected by the Civil Service Commission when subsequent vacancies arise.

Currently, there are four or five firefighter vacancies that the Town intends to fill from among seven candidates selected by the Civil Service Commission in accordance with the ranking of the Eligibility List.[5] (Pl.'s Exs. 25 & 28; Sullivan Test.). All seven candidates forwarded by the Civil Service Commission are white. Mr. Raccio, the Civil Service Commissioner who testified, stated his belief that the Civil Service Commission would not have sent names by rank order if there were any minority candidates still on the Eligibility List and would have forwarded the names of any minority candidates to the Fire Department in adherence to the defendants' affirmative action policy. From Pl. Ex. 31, it appears that the names of the two minority candidates, Applicants Nos. 187 & 232, remain on the Eligibility List.

*Hardship on Hamden from unfilled vacancies*

Hamden wishes to hire its additional firefighters to attend the Fire Department Training Academy Class, which begins

---

2. The circumstances under which he was notified of the agility test were alluded to, but their detail and significance are left for further proceedings.

3. Plaintiffs have recently filed motions to amend their complaint to challenge the defendant's newly instituted requirement of a current EMT or paramedic certification to take the 1999 examination which barred plaintiff Green from sitting for the 1999 written examination.

4. As a general rule, the Civil Service Commission forwards three names for the first vacancy and an additional name for each additional

vacancy. For example, if there were one vacancy three names would be selected whereas if there were three vacancies, five names would be forwarded to the Fire Department Commission.

5. By separate order, the Court found the Town in contempt of its prior order that defendants' provide plaintiffs with notice of any action relating to the 1997 Eligibility List. As remedial sanction, the Court ordered the Town to defer filling any vacancies pending ruling on plaintiffs' motion for injunctive relief. (*See* Doc. # 42).

September 4, 1999, and which will not again be given until January 2000. If not, the Town estimates it will incur an additional expense of $187,000, representing overtime paid to top grade fire department members to cover the current vacancies on each of the four shifts for the next four months in the same manner as the Fire Department is currently using overtime to cover these vacancies. However, as Chief Sullivan acknowledged, this figure is substantially offset by the cost of salaries and benefits (20%) that would be paid to the five new firefighters to be hired.

## A. Irreparable Harm

Plaintiffs argue that if these vacancies are filled before their claims of discriminatory impact are tried, they will be irreparably harmed because vacancies occur so infrequently in Hamden that if the current openings are filled now, and they ultimately prevail at trial, appropriate relief would be greatly "complicated." *NAACP v. Town of East Haven,* 70 F.3d 219, 224 (2d Cir.1995).

In opposing plaintiffs' claim of irreparable harm, defendants juxtapose the financial hardship they face if vacancies remain, namely the interim continued increased overtime expense on each of the four shifts caused by using existing firefighters at overtime rates to cover existing vacancies. Although the Court credits Chief Sullivan's estimate of the overtime costs, it is not persuaded that such expense would be so substantially greater than the increased costs of employing new firefighters even at a lower salary but with 20% additional for benefits, as to constitute significant hardship.

Finally, even though the Second Circuit has noted that plaintiffs' contentions of irreparable harm are to be balanced against "validated public safety concerns," *NAACP v. Town of East Haven,* 70 F.3d 219, 224 (2d Cir.1995), Hamden has not claimed that the continued use of overtime presents any risk to public safety.

## Likelihood of Success

### 1. Legal Standard For A Disparate Impact Claim

The burden of proof in disparate impact cases is now codified at 42 U.S.C. § 2000e–2(k). A plaintiff may establish a prima facie case of disparate impact by showing that use of a specific employment practice causes the selection process of applicants in a racial pattern that significantly differs from that of the pool of applicants. Upon plaintiffs' showing of a prima facie case, the burden then shifts to defendants to demonstrate that the facially neutral policy or practice is "job-related", *see Pietras v. Board of Fire Commissioners,* 180 F.3d 468 (2d Cir.1999) ("The burden of showing that a test that has a disparate impact is job-related is with the department."), or has a "manifest relationship" to the employment in question. *See NAACP v. Town of East Haven,* 70 F.3d at 225. *See also Lanning v. SEPTA,* 181 F.3d 478, 1999 WL 432595, *7 (3d Cir. 1999) ("the [Civil Rights] Act [of 1991] made clear that both the burden of production and the burden of persuasion in establishing business necessity rest with the employer. *See* 42 U.S.C. § 2000e–2(k)."). If the employer makes such a showing, the plaintiffs may still prevail if they can suggest alternative requirements, tests or selection methods that would meet the employer's legitimate business needs while reducing the disparate impact of the employer's practices. *See Bridgeport Guardians, Inc. v. City of Bridgeport,* 933 F.2d 1140, 1147 (2d Cir.1991). Here, plaintiffs challenge Hamden's use of the 1997 written examination as disparately impacting minority applicants in violation of Title VII.

### A. Prima facie case

Since there is no statistical threshold mandating a finding of disparate impact, the Court must assess the significance or substantiality of the disparities on a "case by case" basis considering not only the statistics, but also all the surrounding

facts and circumstances. *See Waisome v. Port Authority of New York and New Jersey,* 948 F.2d 1370 (2d Cir.1991).

■ Under the EEOC's Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607.4 (1998), the so-called "four-fifths rule" states:

A selection rate for any race, sex, or ethnic group which is less than four-fifths (⅘) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact.

The African–American, Hispanic, and overall minority pass rates on the 1997 written examination represent respectively (42%), (36%), and (40%) of the non-minority pass rate,[6] far less than the ⅘ rate referenced in the EEOC Guidelines. Although not controlling, the EEOC's Guidelines are entitled to some deference. *See The Guardians Association of the New York City Police Department, Inc. v. Civil Service Commission of the City of New York,* 630 F.2d 79, 91 (2d Cir.1980), *cert. denied,* 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981) (EEOC Guidelines are "entitled to deference, not obedience"). This extremely low comparative selection rate is highly persuasive evidence supporting an inference that the 1997 written examination had a disparate impact on minority applicants.

Furthermore, the plaintiffs' expert statistician, Dr. Mireia Jofre–Bonet confirms that the disparity in passing rates between African–American, Hispanics and all minorities and non-minorities was "highly significant in statistical terms." This expert testimony combined with the actual undisputed selection percentages, indicates a disparity so great it cannot be accounted for by chance, *see Bridgeport Guardians,*

*Inc. v. City of Bridgeport,* 933 F.2d 1140, 1146 (2d Cir.1991), and "comfortably tips the scales in favor of a finding of disparate impact." *Pietras v. Board of Fire Commissioners,* 180 F.3d 468, 474 (2d Cir. 1999). The Court finds, therefore, that plaintiffs have shown a prima facie case of disparate impact based on Hamden's use of the 1997 written examination as the initial screening mechanism in the hiring process.

### B. Business Justification

■ Although formal validation studies or scholarly work are not required, *Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988), Hamden seeks to justify its use of the 1997 written examination based on the content validation study conducted by CPS and the related testimony of Dr. Forston. Although at trial it will be within the province of the factfinder "to weigh the persuasiveness of the defendant's evidence" related to Hamden's claim of business justification, *EEOC v. Joint Apprenticeship Committee of the Joint Industry Board of the Electrical Indust.,* 186 F.3d 110 (2d Cir.1999) (as amended July 9, 1999), in the context of this preliminary injunction motion, the Court must evaluate the conflicting expert evidence on the 1997 written examination's content validity.

In *Guardians Association of New York City Police Department v. Civil Service Commission,* 630 F.2d 79 (2d Cir.1980), *cert. denied,* 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981), the Second Circuit established how a written test's content validity should be analyzed. In reviewing the district court's conclusion that the employer's written text was infirm because it did not nearly cover all the job content, the Second Circuit pragmatically reasoned that by such analysis no test could be validly constructed because certain re-

---

**6.** The undisputed pass rates by racial group for the 1997 written examination were as follows: African–Americans (33.3%); Hispanics (28.6%); minorities (31.6%); whites (78.8%). *See* Pl.Ex. 32.

quired abilities simply cannot be tested for in written form:

> It is reasonable to insist that the test measure important aspects of the job, at least those for which appropriate measurement is feasible, but not that it measure all aspects, regardless of significance, in their exact proportions.

*Id.* at 98.

CPS's process of conducting its validation study appears to be in accord with the professional guidelines of how such studies should be undertaken. Plaintiffs' expert Dr. Richard C. Barrett, opined, however, that the validation study fails to define KSAs by operational definitions specific to entry level firefighter duties resulting in an inadequate demonstration that the firefighter examination is content valid. In his testimony, he identified deviations he observed in CPS's validation report from professionally accepted professional standards. *See, e.g.,* Uniform Guidelines on Employee Selection Procedures 14 C.14(4) ("KSAs measured by a selection procedure should be operationally defined in terms of observable aspects of the work behavior of the job."). Even though the 1997 written examination only tests 12 of the original 142 KSAs found to be important to performance of critical work behaviors, and the job of firefighter necessarily requires many other KSAs that were not measured by the written test, such deficiencies alone do not render the test invalid as to these 12 KSAs. However, where the written examination is limited in what KSAs it tests, as Dr. Fortson described, the issue is of what significance are the test results as a measurement of competence to perform the job of firefighter. Thus, even though Dr. Barrett claims that some of the KSAs are too vague as defined or that the test questions measuring such KSAs exceed the difficulty required by an entry level firefighter or do not test the KSA identified, the Court does not have sufficient record to conclude that such shortcomings necessarily undermine the examination's validity for the 12 KSAs

it was designed to test including: the ability to understand standard operating procedures (148); to follow written directions (159); to read and understand material dealing with the technical aspects of firefighting (175); to demonstrate knowledge of basic mathematics (3); to apply principles to solve practical problems (155); to add, subtract, multiply, and divide whole numbers (183); to observe details accurately and completely (153); to recognize the purpose of basic tools(174); to apply basic mechanical principles; to extract important information during oral communication (listening ability)(71); to recall factual information (78); and to follow oral directions (158). *See* Def. Ex. 2 at 23. *Compare Fickling v. New York State Dept. of Civil Service,* 909 F.Supp. 185 (S.D.N.Y. 1995) (Parker, J.)(finding civil service examination was needlessly unrepresentative where it tested only 50% of the KSAs identified in the job analysis and seized upon relatively minor aspects of the job).

Nonetheless, even if defendants have shown that the 1997 written examination validly measures these 12 KSAs that are required to perform firefighter duties, the remaining issue is whether the passing score of 60% on this test reasonably measured the minimum entry skill level necessary for an applicant to be a competent fire fighter. *See Lanning v. SEPTA,* 181 F.3d 478 (3d Cir.1999) (finding the 1991 Act restores the *Griggs* standard requiring a discriminatory cutoff score be shown to measure the minimum qualifications necessary for successful performance of the job in question in order to survive disparate impact challenge). As articulated by the Second Circuit in *Guardians Ass'n of New York City Police Dept.,* 630 F.2d at 105 (2d Cir.1980), the concept of validity reflects a continuum such that an otherwise valid test may measure skills related to the job at issue, yet not be valid as applied, based on where the cutoff score is established:

> There should generally be some independent basis for choosing the cutoff .... [A] criterion-related study is not

necessarily required: the employer might establish a valid cutoff score by using a professional estimate of the requisite ability levels, or, at the very least, by analyzing the test results to locate a logical "break-point" in the distribution of score.

*Id.* at 105.

In *Pietras v. Board of Fire Commissioners of the Farmingville Fire District,* 180 F.3d 468, 472 n. 5 (2d Cir.1999), the Second Circuit recently noted in dicta that the town's arbitrary selection of a four minute cutoff for completion of a physical agility test used to assess probationary volunteer firefighters did not reflect the needs of the job where the cutoff was arbitrarily chosen by taking the average of all test scores and adding some extra time. Thus far there has been no evidence of any independent basis or rationale for establishing the cutoff score related to minimum competency levels required for the tested abilities. In *Lanning v. SEPTA,* 181 F.3d 478 (3d Cir.1999), the Third Circuit found that the district court had applied the incorrect standard in finding that SEPTA's hiring practice requiring all police officer candidates to run 1.5 miles in 12 minutes or less was a business necessity even though it had a disparate impact on female candidates. Although the employer may have demonstrated that the more aerobic capacity leads to better performance, the Third Circuit found such conclusion had no bearing on the relevant inquiry—namely whether "a discriminatory cutoff score can be shown to measure the minimum qualifications necessary for the successful performance of the job in question to survive the disparate impact challenge." *Id.* at 493. Similarly, in this case, even assuming defendants have shown that the 1997 written examination validly measures certain important knowledge, skills and abilities required for the entry level position, the Court finds no rational basis or reasoning to support the use of 60% as the appropriate cutoff point. ·Neither the CPS validation study nor the Town's decisional process resulting in the 60% cutoff figure can be seen as reasonably delineating between applicants who were competent to perform the entry level job and those that were not.

No matter how valid the exam, it is the cutoff score that ultimately determines whether a person passes or fails. A cutoff score unrelated to job performance may well lead to the rejection of applicants who were fully capable of performing the job. When a cutoff score unrelated to job performance produces disparate racial results, Title VII is violated.

*Guardians Ass'n of New York City Police Dept.,* 630 F.2d at 104.

Absent any such relationship between the score cutoff and the minimum skill level required for adequate job performance, or a "logical breakpoint" based on the test results, defendants have not demonstrated a valid business justification for their use of a cutoff score of 60% in light of the undisputed disparate impact on minorities, and what appears be an arbitrarily established cutoff that absolutely precluded applicants who fell below it to proceed further in the application process or to in any way demonstrate their level of knowledge, skills and abilities as to the remaining areas untested by the examination. Notwithstanding Mr. Binkoski's description of how he arrived at 60%, the Court has no basis for confidence that such a level identified a minimum level of competence necessary for an entry level firefighter position or that the test was designed to establish such a competence level if 60% of the responses were correct. In fact, Dr. Forston testified that there was no pre-set passing score recommended by CPS when it distributed the test since CPS was not in the business of considering or opining at what level or score an entry level firefighter applicant would be competent. *Cf. Assoc. of Mexican–American Educators v. State of California,* 183 F.3d 1055 (9th Cir.1999) (affirming district court's finding that passing score on test

used to credential teachers "reflect[ed] reasonable judgments about the minimum level of basic skills competence" based on the results of several studies and recommendations of professional educators).

Since defendants have not offered any evidence of how the cutoff score furthered the business necessity of testing for the minimum competence levels for firefighters, the Court finds plaintiffs have shown a likelihood of success on their disparate impact claim.

### Conclusion

Accordingly, the plaintiffs' Motion for a Preliminary Injunction is GRANTED.

The defendants are preliminarily enjoined from filling any entry firefighter vacancies from the 1997 Eligibility List pending trial or further court order. A conference will be held September 2, 1999 at 4:00 p.m. to set the expedited trial schedule for this case.

IT IS SO ORDERED.